**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action No.: 1:26-cv-00275-KFW |
| STATE OF MAINE, et al., | |
| Defendants. | |

## DEFENDANTS' MOTION TO DISMISS

Three decades ago, Justice Sandra Day O'Connor, one of the greatest advocates for our Nation's federalist system of dual sovereignty, expounded that the United States Constitution

> protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.

*New York v. United States*, 505 U.S. 144, 187 (1992). The United States' lawsuit forces this Court to confront whether that day has arrived. Can the federal government compel Maine's Legislature and executive officials to exercise State police powers—specifically to issue confidential license plates for its fleet of federal law enforcement vehicles? The answer is triply: **No**.

From the outset, the Court does not have subject matter jurisdiction to redress the United States' purported injury. Second, the United States fails to state an intergovernmental immunity claim upon which relief may be granted. And finally, the relief sought by the United States is barred by the Constitution's anticommandeering doctrine, which cannot be sidestepped by asking a federal Court to do what the Constitution prohibits. For these reasons, as further detailed in the incorporated Memorandum of Law below, Defendants State of Maine, Governor Janet Mills, Attorney General Aaron M. Frey, and Secretary of State Shenna Bellows respectfully ask the Court to dismiss this action in its entirety.

**MEMORANDUM OF LAW**
**LEGAL BACKGROUND & FACTUAL ALLEGATIONS**

## I.    Federal Regulatory Background

All federal vehicles are required to display "U.S. Government" plates, unless explicitly exempted. 41 C.F.R. § 102-34.95. However, regulation provide for an "unlimited exemption" for certain vehicles "used primarily for investigative, law enforcement, intelligence, or security duties." *Id.* § 102-34.155(a). "Motor vehicles that have been exempted from the requirement to display official U.S. Government license plates . . . must be registered and inspected in accordance with the laws of the jurisdiction where the motor vehicle is regularly operated. *Id.* § 102-34.120.

## II.    Maine Statutory and Regulatory Background

Like all states, Maine has exercised its police powers to establish vehicle registration regime, including requirements for displaying license plates. 29-A M.R.S. §§ 351-562. Generally, cars owned or operated by the State "are exempt from registration fees," but nevertheless "must be registered and are subject to [Maine] inspection requirements." *Id.* § 517(1). And although federal regulation currently requires all non-exempt federal vehicles to carry a "U.S. Government" license plate, the Maine Legislature nevertheless has authorized issuing "registration certificates and plates without fee to federal or other governmental agencies." *Id.* §517 (6).

Separate from State registration requirements, the Legislature decided in 2015 that a small subset of law enforcement vehicles should be permitted to operate on Maine's roads without displaying a government plate. *Id.* § 517(4); *see also* Ex. A.[1] But Maine statute does not entitle

---

[1]  Exhibit A is a letter sent from AG Frey to an Assistant U.S. Attorney General at the United States Department of Justice ("DOJ"), which contains a copy of the application referenced in the Complaint. Although ordinarily cabined to the allegations in the Complaint and any attached exhibits, the First Circuit has acknowledged that trial courts may consider a narrow subset of documents outside of the pleadings on a motion to dismiss. *Ironshore Specialty Ins. Co. v. United States*, 871 F.3d 131, 135 (1st Cir. 2017). These include: (1) documents whose authenticity the parties do not dispute; (2) official public records; (3) documents central to plaintiffs' claim; and (4) documents "sufficiently referred to in the complaint." *Id.*

1

any agency, officer, or vehicle to an unmarked plate.  Instead, the Legislature made a concerted policy decision to permit exemptions on a case-by-case basis. 29-A M.R.S. § 517(4).

It delegated authority to make such authorizations to the executive branch official tasked with overseeing Maine's motor vehicle registration—the Secretary of State ("Secretary").  *Id.* Aside from limiting exemptions to "unmarked motor vehicle[s] used primarily for law enforcement," Maine's Legislature otherwise vested the Secretary with absolute discretionary authority over which vehicles are exempt.  *Id.*  When approved, the Secretary issues the registrant a confidential plate, to be displayed in lieu of standard government plates.  *See* Ex. A at 3.

Maine keeps a database of all confidential plates and corresponding vehicles.  *Id.* at 4.  Like all Maine license plates, confidential plates are the property of the State government and may not be transferred without the Secretary's authorization and approval.  *Id.*; *see also* 29-A M.R.S. § 463(1) (plates are State property); 29-A M.R.S. § 517(4).  If an individual requests information under Maine's Freedom of Access Act pertaining to a vehicle displaying confidential plates, the Secretary withholds the information from public disclosure and instead provides the requester's contact information to the law enforcement agency issued the plate.  Ex. A at 4.

To assist in decision-making—and to assure the vehicle is otherwise statutorily eligible— the Secretary developed an application.  *Id.* at 3.  Filling out the form does not guarantee approval. Instead, the Secretary uses information supplied by the application to assist in her determination of whether to issue a discretionary exemption.  *Id.*; *see also* 29-A M.R.S. § 517(4).

### III.   Facts and Allegations

Federal law enforcement agencies across the country use and display "confidential license plates that cannot easily be tied back to their agencies through records requests or other means."

2

Compl. ¶ 1.[2] In order to review her policies, the Secretary paused Maine's issuance of confidential plates around January of 2026. *Id.* ¶ 31; Feb. 9, 2026 Ltr. ("Ex. B."). Upon completing her review in February, she sent federal agencies a letter providing the program's updated application. Compl. ¶ 32; Ex. B. Among other items, it required applicants to provide information regarding how the vehicle seeking the confidential plate was to be used. Compl. ¶ 32. It also provided space for the requesting agency-head to acknowledge several statements outlining that the plates would be used in accordance with the Secretary's application of 29-A M.R.S. § 517(4); Ex. B at 2. *Id.* ¶ 35. The form also notified applicants of Maine's general criminal statute for "unsworn falsification" of statements made on official government forms. Compl. ¶ 37; *see also* 17-A M.R.S. § 453.

On May 12, 2026, United States Assistant Attorney General Brett Shumate wrote on behalf of the DOJ to Attorney General Frey, protesting certain aspects of the updated application. May 12, 2026 Ltr. ("Ex. C"). In particular, DOJ asserted that the form's acknowledgement that the confidential plate would not be used for civil immigration enforcement violates the Constitution's intergovernmental immunity doctrine. *Id.* at 2. DOJ also asserted that it is unconstitutional for Maine to only impose such requirements on federal, but not state or local law enforcement. *Id.*

Attorney General Frey responded on May 22, informing DOJ that Maine law grants the Secretary sole discretionary authority to issue confidential license plates to unmarked vehicles for law enforcement purposes. Ex. A. at 1. He also relayed a concern to DOJ that 16 recent applications appeared to contain "material false information." *Id.* But he also noted the Secretary

---

[2] This Motion assumes as true all well-pleaded factual allegations. *Ocasio-Hernandez*, 640 F.3d at 10-11. However, "legal conclusions contained within a complaint are not entitled to a presumption of truth." *Id.* Nor allegations "contradicted by a written document that is properly before" the Court. *Better Way Ford, LLC v. Ford Motor Co.*, No. 2:21-CV-00116-NT, 2024 WL 1240448, at *7 (D. Me. Mar. 14, 2024), aff'd, 142 F.4th 67 (1st Cir. 2025); *see also Yacubian v. United States*, 750 F.3d 100, 108 ("[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." (quoting *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 229 n. 1 (1st Cir. 2013))).

had approved 48 requests across 8 federal agencies in 2026, notwithstanding the 16 at issue.  *Id.* at 2.

Attorney General Frey stated the application had been updated in May "to address FBI concerns," and that the DOJ's FBI seemed satisfied.  *Id.* at 2, n.1.  He clarified that the Secretary "requires all law enforcement agencies, both state and federal, to submit both their registration and a signed application if they wish to obtain a confidential license plate."  *Id.* at 2 (emphasis added).  And he enclosed a courtesy copy of the application, which confirms the requirements apply to both state and federal law enforcement officials, and welcomed further discussion.  *Id.* at 3-4.

Five days later, the same Assistant U.S. Attorney General who corresponded with Attorney General Frey filed suit on behalf of the United States, alleging in the Complaint that "it appears that the revised form pertains only to federal agencies seeking confidential plates in Maine and does not apply to state or local agencies."  Compl.  ¶ 39.  Although the application illustrates its applicability to state and local law enforcement officials alongside their federal counterparts, the United States opted not to include the judicially noticeable document among its pleadings.

## LEGAL STANDARDS

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief could be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* at 678 (internal quotation marks omitted).  As part of this examination, the Court ordinarily accepts as true all well-pleaded factual allegations, drawing all reasonable inferences in the plaintiff's favor.  *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009).

4

This process begins "by separating a complaint's factual allegations from its legal conclusions," the latter of which "are not entitled to a presumption of truth." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 10 (1st Cir. 2011). Although factual allegations are "ordinarily" accepted as true, "some allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that the fail to cross 'the line between the conclusory and the factual.'" *Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 595 (1st Cir. 2011). Such threadbare allegations are not enough to survive Rule 12(b)(6). *Id.* (citing *Iqbal*, 556 U.S. at 1944).

The standards governing a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) are similar to those for a Rule 12(b)(6) motion, except that a trial court is entitled to resolve any factual disputes between the parties that are necessary "in order to determine its own jurisdiction." *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001); *see also Lyman v. Baker*, 954 F.3d 351, 359 (1st Cir. 2020) (noting that "the same basic principles apply" when reviewing motions to dismiss under Rules 12(b)(1) and 12(b)(6)).

## ARGUMENT

The United States cannot prevail in this action for three reasons. First, it has failed to plead facts that would fulfill Article III standing's "case or controversy" requirement, depriving the Court of subject matter jurisdiction. Second, it has failed to set forth a plausible claim that Maine has violated its intergovernmental immunity, because Maine neither discriminates against the federal government, nor does it attempt to regulate its operations within State borders. Finally, even if had set forth a plausible claim for relief in the abstract (and it did not), the United States' attempt to dictate the structure of Maine's vehicle registration regime—or any requests it makes of this Court to re-write Maine's statutes—violates the Constitution's anticommandeering doctrine grounded in its federalist structure and enshrined in the Tenth Amendment's text. As further

5

detailed below, each of these defects independently provides the Court with sufficient grounds to dismiss this suit.

I.    **Because the United States failed to plead facts that would establish any of the three requirements for Article III standing, there is no "case or controversy," depriving this Court of subject matter jurisdiction.**

      A.    Article III standing requires plaintiffs to allege facts illustrating (1) an injury-in-fact; (2) caused by the defendant; (3) which the Court has authority to redress.

To invoke federal jurisdiction, plaintiffs must plead facts establishing Article III standing. *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016). In any action plaintiffs "must 'demonstrate standing separately for each form of relief sought.'" *Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*, 120 F.4th 904, 911 (1st Cir. 2024). Establishing standing requires pleading factual allegations that fulfill "each part of a familiar triad: injury, causation, and redressability." *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012); *see also Lyman*, 954 F.3d at 360 ("The heartland of constitutional standing is composed of the familiar amalgam of injury in fact, causation, and redressability."). Parties invoking federal jurisdiction bear the burden of establishing standing "at each stage of the litigation." *Taker v. Blanche*, 179 F.4th 96, 101 (1st Cir. 2026).

First, an injury-in-fact requires invasion of a legally protected interest. *See Lyman*, 954 F.3d at 360. Second, plaintiffs must establish "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." *Id.* at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 43(1976)). When plaintiffs fail to establish all three elements on any claim asserted, Courts are obligated to dismiss deficient claims for lack of subject matter jurisdiction. *See Plazzi v. FedEx Ground Package Sys., Inc.*, 52 F.4th 1, 4 (1st Cir. 2022).

B. The United States fails to plead allegations that would establish an injury in fact.

From the get-go, the Complaint does not allege that any specific federal agency or officer has actually been harmed by the Secretary's actions. It thus does not include an injury-in-fact, the "'[f]irst and foremost' of standing's three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Rather, the United States makes purely speculative (and many erroneous) assertions about only the potential impacts of not obtaining Maine's confidential plates. *See, e.g.,* Compl. ¶¶ 24; 43-51. Such "perfunctory and conclusory" allegations lack in "specific information as to the harm that has befallen" the United States, and cannot suffice Article III. *Kolackovsky v. Town of Rockport*, 165 F.4th 114, 120 (1st Cir. 2026). The Complaint contains no "concrete" injury fairly traceable to and of the Defendants. *Spokeo, Inc.,* 578 U.S. at 339 ("concrete" injuries "must actually exist" and are "'real, and not 'abstract.'"); *see also TransUnion LLC v. Ramirez,* 594 U.S. 413, 417 (2021) ("No concrete harm, no standing," regardless of whether federal law is violated).

C. The United States fails to establish how the Court could "likely" redress its purported legal injury.

As recently as June, the First Circuit reiterated the importance of the redressability requirement of Article III standing in *Taker*. 179 F.4th at 101-03. In *Taker*, the plaintiff had attempted to lodge a Second Amendment challenge against several Maine and federal criminal statutes, which all barred him from possessing firearms. *Id.* at 98. However, at the time he filed suit, Taker was subject to a Maine "Protection from Abuse Order" ("PFA Order"), independently barring him from possessing firearms and subjecting him to criminal penalty for violations. *Id.* at 99. Yet Taker did not challenge the PFA Order's constitutionality, proving fatal to his appeal. *Id.*

The First Circuit explained that even if Taker were to prevail in striking down the four statutes he challenged under the Second Amendment, it nevertheless would still have been unlawful for Taker to possess a firearm in Maine when he filed suit, due to the existence of the

7

active, unchallenged PFA Order. *Id.* at 102 ("[W]e do not see how, while the [PFA Order] remained in effect, the requested declaratory and injunctive relief would have redressed that injury."). Thus, Taker's asserted legal injury—deprivation of his right to lawfully possess a firearm—could not "likely" have been "redressed by a favorable decision," based upon the allegations of his complaint. *Id.* at 103. As the First Circuit noted, when a plaintiff fails to plead facts that would establish a legal injury likely redressable through the lawsuit, Article III's "case or controversy" requirement is not satisfied, and federal courts lack jurisdiction. *Id.*

The United States finds itself in the same position as the unsuccessful plaintiff in *Taker*. There, Taker lacked standing because the unchallenged PFA Order continued to serve as a legal barrier to firearm possession, regardless of whether his lawsuit had succeeded. *Id.* at 102 ("During that period, the [PFA Order] itself would have barred Taker from possessing such a weapon and thus prevented his alleged injury from having been redressed[.]"). In other words, Taker's legal relationship with firearms would remain unchanged, even if his lawsuit had succeeded, because no matter the outcome, it would still have been a crime for him to possess a gun.

Like *Taker*, the United States fails to satisfy the redressability requirement of Article III because the ultimate remedy it seeks cannot guarantee a cure for its alleged injury. And that is because no law enforcement officer or agency in Maine is ever entitled to a confidential plate. Instead, Maine's Legislature made an explicit policy choice to exempt only a <u>limited number</u> of law enforcement vehicles. 29-A M.R.S. § 517(4). While it could have mandated that such plates must be available to all law enforcement agencies upon request, the Legislature opted otherwise. Instead, it delegated to the Secretary—Maine's executive official charged with overseeing motor vehicle registration—the sole authority to determine when exemptions are appropriate. *Id.* (exempting unmarked law enforcement vehicles "when authorized by the Secretary").

8

Maine acknowledges that officials tasked with civil immigration enforcement are not currently able to obtain a confidential license plate from the State.  Compl. ¶ 3.  But the United States has failed to plead allegations that would establish that federal officials would "likely" obtain a confidential plate if it prevails.  Nor could it.  Given that Maine law provides the Secretary with sole discretion to issue unmarked plates pursuant to 29-A M.R.S. § 517(4)—a statute that the United States does not challenge.  Accordingly, the Complaint's failure to fulfill Article III's redressability requirement deprives the Court of jurisdiction.  *Taker*, 179 F.4th at 101-102.

D.  The United States' redressability defect exposes its lack of Article III "causation."

The Court's inability to redress the United States' purported injury reveals yet another fatal flaw in its standing theory: whatever "sovereign injury" the United States claims to suffer was not "fairly traceable" to the Secretary's policy.[3]  *Lujan*, 504 U.S. at 560.  And if an injury is not "fairly traceable" to a Defendant's alleged acts or omissions, but is instead attributable to some "independent action of some third party," then Article III's "causation" requirement cannot be met. *Id.*  This, too, deprives the Court of subject matter jurisdiction and warrants dismissal.  *Id.*

II.  **The United States has failed to state an intergovernmental immunity claim.**

The United States has failed to state a claim upon which relief could be granted.  Maine has not violated its intergovernmental immunity because the State is neither discriminating against, nor regulating the federal government.  Moreover, the United States' claims against Governor Mills and Attorney General Frey should also be dismissed for failing to make any substantive allegations against them at all.

---

[3] If "traceable" to anything in Maine at all, the United States' purported injury has been "caused by the Maine Legislature's" failure to set up a vehicle registration system that allows all federal law enforcement to obtain confidential plates.  Aside from being no more "traceable" to the Maine Legislature's inaction than Congress's, this only serves to underscore why the United States demands violate the anticommandeering doctrine, as explained below in Part III.

A.  Maine is not discriminating against the federal government.

In Count I, the United States argues the Secretary's application violates intergovernmental immunity by unconstitutionally subjecting it to discrimination.  Compl. ¶¶ 69-73.  But the United States admits that its entire theory is grounded in an allegation made "upon information and belief" that Maine's state and local officials "have no similar attestation requirement."  Compl. ¶ 5.  This information and belief is purportedly "[b]ased upon Maine's February letter, which explained that Maine had paused the issuance of new confidential license plates to federal agencies."  *Id.* ¶ 39.

Such an inference would be arguably tenuous under *Iqbal*'s "plausibility" standard.  556 U.S. at 678.  But in any event, it is impossible to square the United States' allegation that "it appears that the revised form pertains only to federal agencies . . . and does not apply to state or local agencies," *id.*, with the actual text of the application, *see* Ex. A at 3-4.  Moreover, Maine's Attorney General informed DOJ five days before it filed suit that the Secretary "requires all law enforcement agencies, both state and federal, to submit both their registration and a signed application, if they wish to obtain a confidential license plate."  Ex. A. at 2 (emphasis added).

Therefore, it is simply not plausible for the United States to allege only upon information and belief that Maine is singling it out "for less favorable treatment."  *United States v. Washington*, 596 U.S. 832, 839 (2022).  If state or local law enforcement officers in Maine are engaged in civil immigration enforcement, the Secretary treats them just the same as federal officials engaged in that activity.  Ex. A at 1-2.  And "[w]here Maine law enforcement officers do not conduct civil immigration enforcement, they are not similarly situated to federal immigration officials for purposes of determining whether discrimination has occurred."  *Id.* at 4.  Instead, the correct comparator for such Maine law enforcement officers would be the four-dozen law enforcement officials across eight federal agencies issued confidential Maine plates in 2026.  *Id.* at 3-4.

10

B.  Maine is not regulating the federal government.

Intergovernmental immunity bars states from "interfering with or controlling the operations of the Federal Government." *Washington*, 596 U.S. at 838.  But Maine is doing nothing to "control" federal immigration officials.  Nor is it stepping between federal immigration officials to "interfere" with the lawful execution of federal policies.  Instead, as Part III details, Maine has made a constitutionally protected policy choice to not dedicate Maine's resources, property, or regulatory framework to assist with the United States' civil immigration enforcement policies.

The United States' citation to *Leslie Miller, Inc. v. Arkansas*, *see* Compl. ¶46, underscores the difference between a state's violation of intergovernmental immunity and Maine's legitimate decision not to join in with the federal government to carry out federal policy.  In *Leslie Miller*, Arkansas prosecuted a federal contractor for failing to comply with state licensing requirements before winning and performing a federal government contract on a military base.  352 U.S. 187, 188 (1956) (per curiam).  In vacating the conviction under intergovernmental immunity, The Supreme Court concluded that Arkansas's licensing requirement required federal contractors to "desist from performance until they satisfy a state officer." *Id.* at 190.  In other words, state statute operated as a direct barrier to the federal government's ability to contract with a third party.  *Id.*

Maine has done nothing of the sort.  If there is legitimate immigration policy to pursue within State borders, Maine is not stopping the federal government from executing it.  It has not attempted to bar federal vehicles from its roads.  Nor does Maine subject the federal government to any special requirement before entering the State.

*Johnson v. Maryland*, 254 U.S. 51 (1920), highlights the difference between a violation of intergovernmental immunity and Maine's valid choice to not assist in executing federal policy.  In *Johnson*, the Supreme Court vacated a federal mail carrier's conviction for operating a vehicle

11

without a driver's license. *Id.* at 55. As Justice Holmes explained, the violation arises when a state's actions "interrupt the acts of the general government itself." *Id.* But Maine has not acted to "interrupt" or stand between the federal government and enforcement of its immigration policies. Instead, Maine has merely opted not to contribute the State's resources toward efforts that assist in disguising a different government's vehicles from Maine's citizens.

The United States asserts that Maine's confidential plates are "a critical component of safe, effective, and lawful federal law enforcement operations." Compl. ¶ 62. At other times it has variously referred to them as "crucial," *id.* ¶ 63, an "important tool," *id.*, "critical to the success" of federal operations, *id.* ¶¶ 23-24, "essential," *id.* ¶ 25, and part of the federal government's "operational needs," *id.* ¶ 44. But all of this hype raises a simple question: If confidential plates are "essential" to the "operational needs" of federal law enforcement, then why on earth would the federal government attempt to outsource such a "crucial" tool upon which it must "rely," to the patchwork of 50 sovereign states, subjecting it to a kaleidoscope of vehicle registration regimes?

The United States' assertion that Maine has violated its intergovernmental immunity fails to state a claim upon which relief could be granted, and the Court would be justified in dismissing this suit on these grounds, alone. But that is not all. As Part III explains below, the real Constitutional violation facing the Court is the federal government's attempt to commandeer Maine's motor vehicle regulatory regime as an "important tool" to fulfill its "operational needs."

C. <u>There are no allegations involving Governor Mills or Attorney General Frey.</u>

The Complaint references Governor Mills and Attorney General Frey only one time apiece, asserting that they are being sued in their official capacities. Compl. ¶¶ 13-14. Because there are no substantive allegations against them, there is no plausible relief the United States can win against them. *See Iqbal*, 556 U.S. 678; *see also United States v. Massachusetts*, No. 1:26-cv-

12

12401-WGY, ECF No. 18 (D. Mass. July 20, 2026) (dismissing Massachusetts Attorney General in similar action regarding confidential plates).  Nor has the United States established standing to sue them. *See Taker*, 179 F.4th at 102.  They should accordingly be dismissed.

### III.  The anticommandeering doctrine bars the United States' claims.

    A.  The Tenth Amendment prohibits the United States from commandeering State governments into the service of federal regulatory purposes."

The Tenth Amendment consists of a single sentence: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  Yet through the Tenth Amendment's ratification, the Framers made a concerted effort to underscore the importance of an explicit directive to the new national government which was already implicit in the Constitution's structure: "Congress may not simply 'commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *New York*, 505 U.S. at 161.[4]  Instead, "[w]here a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents." *Id.* at 178.

Under the Articles of Confederation, the federal government generally lacked the authority to regulate its citizens, which generated "lively debate among the Framers" of the Constitution when deciding whether Congress should enjoy the authority to "employ state governments as regulatory agencies." *Id.* at 163.  Ultimately, the Framers opted for a stronger central government, but nevertheless "explicitly chose a Constitution that confers upon Congress the Power to regulate

---

[4]  *See also New York*, 505 U.S. at 156 ("This amendment is a mere affirmation of what, upon any just reasoning, is a necessary rule of interpreting the constitution. Being an instrument of limited and enumerated powers, it follows irresistibly, that what is not conferred, is withheld, and belongs to the state authorities." (quoting 3 J. Story, Commentaries on the Constitution of the United States 752 (1833))); *id.* at 156-57 ("The Tenth Amendment likewise restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which, as we have discussed, is essentially a tautology.").

individuals, not States." *Id.* at 166. Even in circumstances where "Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *Id.*

And so even though the Constitution's Commerce Clause authorizes Congress to directly regulate interstate commerce, it nevertheless may not "regulate state governments' regulation of interstate commerce." *Id.* Instead, if the federal government wishes to encourage certain behavior among the States, it may use its spending power to attach conditions on States' receipt of certain federal dollars. *Id.* at 167. Alternatively, in areas where the Commerce Clause has authorized Congress to regulate, Congress enjoys the power "to offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation." *Id.*

The Supreme Court's fidelity to the anticommandeering principle has only grown stronger in the three decades since deciding *New York*. In striking down portions of the Brady Act, it stressed that the doctrine does not distinguish between a federal command for states to enact public policy and a federal requirement that state officials merely provide a "limited, non-policymaking help in enforcing the law." *Printz v. United States*, 521 U.S. 926-27. In acknowledging that executive action rarely, if ever, involves "utterly no policymaking," it concluded that attempting to draw such lines would be a futile exercise. *Id.* at 928 ("[A]n imprecise barrier against federal intrusion upon state authority is not likely to be an effective one.").

More recently in *Murphy v. N.C.A.A.*, 584 U.S. 453 (2018), the Supreme Court illustrated that it is possible for the federal government to violate the Constitution's anticommandeering doctrine, even in situations where States need not take any action in order to comply. In *Murphy*, the Supreme Court confronted a quarter-century old federal statute, the Professional and Amateur Sports Protection Act, where Congress purported to make it "unlawful" for States to operate or

14

authorize sports betting. *Id.* at 461. There, the United States argued that the anticommandeering doctrine only prohibits the federal government from using the States to affirmatively regulate, but that "prohibiting a State from enacting new laws is another matter." *Id.* at 474. The Supreme Court roundly rejected this theory, explaining that the coercive nature of a federal directive to States does not vanish simply because it attempts to commandeer by way of prohibition, rather than an instruction to affirmatively regulate. *Id.* at 475 ("This distinction is empty.")

B. Seizing Maine's vehicle registration system to camouflage federal vehicles violates the Tenth Amendment and the anticommandeering doctrine.

Here, the United States seeks to take the reins of Maine's vehicle registration system, demanding that the state "issue confidential license plates to Federal Agencies primarily responsible for the enforcement of federal civil immigration laws." Compl. ¶ 72. When examined alongside the circumstances of *New York*, *Printz*, and *Murphy*, the federal government's unlawful attempt to infringe upon Maine's sovereignty is obvious.

In *New York*, the Supreme Court upheld a large swath of the Low–Level Radioactive Waste Policy Amendments Act of 1985, specifically portions relying on Congress's taxing power to regulate private actors, as well as provisions relying upon Congress's spending power to condition federal funding to States upon achieving certain regulatory goals. 505 U.S. at 171-74. However, it found the Act had "crossed the line distinguishing encouragement from coercion" where it required States to choose between "either accepting ownership of [nuclear] waste [generated within State borders] or regulating according to the instructions of Congress." *Id.* at 175.

In *Printz*, the Supreme Court struck down provisions of the Brady Act requiring state law enforcement officers to perform background checks for handgun purchases, noting the unconstitutional nature of such a demand was "clear" in light of the anticommandeering doctrine. 521 U.S. at 933. While in *Murphy*, the only demand Congress made of states was to <u>not</u> take

15

affirmative steps to approve, legalize, or authorize, sports gambling. 584 U.S. at 474. Even though compliance for New Jersey simply meant doing nothing at all, the statute nevertheless violated its sovereignty by "unequivocally dicat[ing] what a state legislature may and may not do." *Id.*

Today, the federal government's attempt to encroach upon Maine's sovereignty is no less heavy-handed than its actions in *New York*, *Printz*, and *Murphy*. In many respects it's much worse. In each of the previous cases, the federal government had at least attempted to use its legitimate Commerce Clause authority to regulate fields that no one would question are within Congress's purview—disposal of nuclear waste, requiring individuals undergo background checks for firearms purchases, and regulating commercial gambling, respectively. But Maine's vehicle registration regime is a classic state police power, long recognized by the Supreme Court. *See Am. Trucking Assoc., Inc. v. Mich. Pub. Serv. Comm'n*, 454 U.S. 429 (describing state regulation of vehicles within state borders as "an unobjectionable exercise of the State's police power").

And yet the federal government seeks to hijack Maine's vehicle registration regime for the entirely separate purpose of assisting it to camouflage its fleet of law enforcement vehicles. Compl. ¶ 71. Even if the federal government has strategically avoided asking the Court to order Maine to issue it confidential plates, *Murphy* demonstrates why this is an empty distinction. *See* 584 U.S. at 475. Here, the United States is asking the Court to re-write a Maine statute providing the Secretary with sole authority to decide on a case-by-case basis whether to authorize a law enforcement vehicle to operate with a confidential State of Maine license plate. *See* Compl. ¶ 77 (incorrectly asserting that confidential license plates are "otherwise available" to them under Maine law). Nor does it matter that the United States' executive branch is attempting to launder this attempt via a federal court docket—the Constitution does not distinguish between violations of the anticommandeering doctrine among the three branches of government. *See Strahan v. Coxe*,

16

127 F.3d 155, 169 (1st Cir. 1997) ("[T]he commands of the Tenth Amendment apply to all branches of the federal government, including the federal courts[.]").

Given the breathtaking scope of the federal government's demand, it would be difficult to concoct a better example of an attempt to "commandeer[] state executive and legislative officials to implement federal policies" in violation of the Tenth Amendment. *United States v. Joseph*, 26 F. 4th 528, 534 (1st Cir. 2022). The Court should not bless these efforts.

C. The Constitution's federalist structure supports Maine.

When the Supreme Court decided *Murphy*, it summarized three rationales for "why adherence to the anticommandeering principle is important." 584 U.S. at 473. All support Maine over the United States. First, it noted the Constitution's structure of dual sovereignty is not merely something the Framers established "for the benefit of the States or state governments as abstract political entities." *Id.* (quoting *New York*, 505 U.S. at 181). Rather, "[a] healthy balance of power between the States and the Federal Government [reduces] the risk of tyranny and abuse from either front." *Id.* (second alteration in original) (quoting *New York*, 505 U.S. at 181-82). If the United States wishes to incentivize States into taking a desired action via federal funding grants, then the individual States a free to make that choice. But it may not usurp that decision for them.

Second, the Supreme Court emphasized that the anticommandeering rule "promotes political accountability." *Id.* By retaining the American system of dual sovereignty, it allows "[v]oters who like or dislike the effects of the regulation [to] know who to credit or blame." *Id.* There is no question that the recent actions taken by ICE have generated significant public reaction across the nation. *See, e.g.*, *Tincher v. Noem*, 816 F. Supp. 3d 931, 968 (D. Minn. 2026) (concluding that members of the public have a protected First Amendment interest in "observ[ing] and record[ing] ICE officers in part to express their disapproval"). And for purposes of

17

accountability, it does not matter which side of the policy debate a voter takes; the anticommandeering doctrine allows citizens who approve of a particular federal policy to distinguish between actions taken by the state and federal officials, just as much as it allows those who disapprove.  "By contrast, if a State imposes regulations only because it has been commanded to do so by Congress, responsibility is blurred."  *Murphy*, 584 U.S. at. at 473-74.

Third, the Supreme Court explained that "the anticommandeering principle prevents Congress from shifting the costs of regulation to the States."  *Id.* at 174.  By requiring Congress to regulate directly via the spending clause, the anticommandeering doctrine requires it to "weigh the expected benefits of the program against its costs," rather than issuing an unfunded mandate to the States.  *Id.*  This is particularly relevant here, where the federal government's demand would result in forcing Maine taxpayers to shoulder the cost of (1) producing confidential Maine plates; (2) providing State property to the federal government; and (3) maintaining an vehicle registration regime that satisfies whatever federal demands of the day might be for maintaining confidentiality.

Beyond *Murphy*'s rationales, requiring Maine to use State tax dollars to restructure its vehicle registration regime not only constitutes a direct violation of the Tenth Amendment, but it would operate to disadvantage Maine taxpayers against citizens of other states, in violation of the spirit—if not outright text—of Article I's Uniformity Clause.  *See* U.S. Const., art. I, § 8, cl. 1.

Finally, the United States' demand violates yet another aspect of Maine's sovereignty which the anticommandeering doctrine surely prohibits: compelled speech.  Half a century ago, the Supreme Court held that the First Amendment prohibited New Hampshire from compelling its motorists to display a license plate carrying government speech, where a citizen felt "coerced by the State into advertising a slogan which [he found] morally, ethically, religiously and politically abhorrent."  *Wooley v. Maynard*, 430 U.S. 705, 713 (1977).  Like the Granite State, Maine also

stamps its speech on motorists' plates.[5]  And so if the United States were permitted to seize Maine property carrying the State's message and motto for purposes of camouflaging the federal government's immigration fleet, voters risk incorrectly assuming that Maine endorses any and all of the consequences that flow from the federal government's immigration policies within Maine's borders.  This would be no less coercive than New Hampshire foisting its love of freedom upon its unwilling motorists' fenders.  *Wooley*, 430 U.S. at 714 ("The right to speak and the right to refrain from speaking are complementary components of the broader concept of "individual freedom of mind." (quoting W. Va. *Bd. of Ed. V. Barnette*, 319 U.S. 624, 631 (1943))).

So although Maine does not enjoy individual rights under the First Amendment like the motorist in *Wooley*, the anticommandeering doctrine prohibits the federal government from coercing Maine to speak, just as it protects it from compelled regulation.  *See Shurtleff v. Boston*, 596 U.S. 243, 251 (2022) (noting "must be true for government to work" that "it naturally chooses what to say and what not to say"); *cf. Printz*, 521 U.S. 898, 920 (1997) ("The Constitution thus contemplates that a State's government will represent and remain accountable to its own citizens.").  Just as "Boston could not easily congratulate the Red Sox on a victory were the city powerless to decline to simultaneously transmit the views of disappointed Yankees fans," *Shurtleff*, 596 U.S. at 251-51, Maine cannot properly express the collective will of its citizens regarding federal immigration operations if it is also forced to hand over State property implying that the federal government's immigration actions carry Maine's stamp of approval.

Protecting Maine's sovereign right to choose "what to say and what not to say," *id.* at 251, is just one more reason why the United States' suit should not be permitted to proceed.

---

[5] See Bureau of Motor Vehicles to Begin Issuing New Pine Tree License Plate on May 1, 2025, Maine.gov (Mar. 19, 2025), https://www.maine.gov/sos/news/bureau-motor-vehicles-begin-issuing-new-pine-tree-license-plate-may-1-2025.

\*      \*      \*

"The Federal Government may not compel the States to enact or administer a federal regulatory program. . . . The Constitution enables the Federal Government to pre-empt state regulation contrary to federal interests, and it permits the Federal Government to hold out incentives to the States as a means of encouraging them to adopt suggested regulatory schemes. It does not, however, authorize Congress simply to direct the States to provide" camouflaging equipment for federal vehicles at the behest of the federal executive. *New York*, 505 U.S. at 188. Accordingly, the anticommandeering doctrine enshrined in the Constitution's federalist structure of dual sovereignty entitles the State of Maine and its executive officers to dismissal.

### CONCLUSION

For the reasons set forth above, the State of Maine, Governor Mills, Attorney General Frey, and Secretary Bellows respectfully request that the Court dismiss this suit.

Dated:  August 3, 2026

Respectfully Submitted,

AARON M. FREY
Attorney General

*/s/ Paul E. Suitter*
Paul E. Suitter, Me. Bar No. 5736
paul.suitter@maine.gov
Halliday Moncure, Me. Bar No. 4559
halliday.moncure@maine.gov
Assistant Attorneys General
Office of the Maine Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel. (207) 626-8800

*Counsel for Defendants*

20