**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF MAINE; JANET MILLS, Governor of Maine, in her official capacity; AARON FREY, Attorney General of Maine, in his official capacity, SHENNA BELLOWS, Secretary of State of Maine, in her official capacity,<br><br>Defendants. | Case No.: 1:26-cv-00275 |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF CONTENTS .................... i
TABLE OF AUTHORITIES .................... ii
INTRODUCTION .................... 1
BACKGROUND .................... 2
I. Legal Framework .................... 2
II. The Policy .................... 4
LEGAL STANDARDS .................... 6
ARGUMENT .................... 6
I. The United States Has Standing to Bring this Challenge. .................... 6
A. The United States Has Adequately Pled an Injury in Fact .................... 6
B. The United States' Injuries are Fairly Traceable to the Policy .................... 9
C. The United States' Injuries are Redressable .................... 10
II. The Complaint States a Claim That the Policy Violates Intergovernmental Immunity .. 11
A. The Policy Directly Regulates the Federal Government .................... 12
B. The Policy Discriminates Against the Federal Government .................... 16
C. Maine's Reliance on the Tenth Amendment is Inapposite .................... 18
III. The Claims Against Attorney General Frey Should Not be Dismissed .................... 20

## TABLE OF AUTHORITIES

**Cases**

*Antilles Cement Corp. v. Fortuno*,
670 F.3d 310 (1st Cir. 2012) .... 10

*Arizona v. United States*,
567 U.S. 387 (2012) .... 3, 16 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .... 6

*Beddall v. State St. Bank & Tr. Co.*,
137 F.3d 12 (1st Cir. 1998) .... 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .... 6

*Boeing Co. v. Movassaghi,*
768 F. 3d 832 (9th Cir. 2014) .... 17

*Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*,
4 F.4th 63 (1st Cir. 2021) .... 6

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .... 9

*Conservation L. Found., Inc. v. Acad. Express, LLC*,
129 F.4th 78 (1st Cir. 2025) .... 6, 9

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025) .... 14

*Dawson v. Steager,*
586 U.S. 171 (2029) .... 18

*Diamond Alternative Energy*, *LLC v. Envtl. Pro. Agency*,
606 U.S. 100 (2025). .... 11

*Elk Grove Unified Sch. Dist. v. Newdow*,
542 U.S. 1 (2004) .... 12

*Ex parte Neagle*,
135 U.S. 1 (1890) .... 16

*Fiallo v. Bell*,
430 U.S. 787 (1977) .... 18

*Hancock v. Train*,
426 U.S. 167 (1976) .... 12

*Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*,
452 U.S. 264 (1981) .... 18

*Johnson v. Maryland*,
254 U.S. 51 (1920) .... *passim*

*Kokkonen v. Guardian Life Ins. Co.*,
511 U.S. 375 (1994) .......... 6

*Leslie Miller, Inc. v Arkansas,*
352 U.S. 187 (1956) .......... 12,13

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... *passim*

*Maine v. United States Dep't of Health & Hum. Servs.*,
923 F.3d 209 (1st Cir. 2019) .......... 9

*Mayo v. United States*,
319 U.S. 441 (1943) .......... 12

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .......... 12, 14

*Murphy v. United States*,
45 F.3d 520 (1st Cir. 1995) .......... 6

*New York v. United States*,
505 U.S. 144 (1992) .......... 18

*North Dakota v. United States*,
495 U.S. 423 (1990). .......... 15, 16, 17

*Oceanic Navigation Co. v. Stranahan,*
214 U.S. 320 (1909) .......... 18

*Printz v. United States*,
521 U.S. 898 (1997) .......... 14

*Reno v. Condon*,
528 U.S. 141 (2000) .......... 14

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) .......... 2

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 7

*Taker v. Blanche*,
179 F.4th 96 (1st Cir. 2026) .......... 10,11

*Tennessee v. Davis*,
100 U.S. 257 (1879) .......... 2, 3

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 7

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) .......... 7, 15, 16

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .......... 12

*United States v. City* of Philadelphia,
2026 WL 1906075 (E.D. Pa. July 2, 2026) ........ 15

*United States v. City of Pittsburgh*,
757 F.2d 43 (3d Cir. 1985) ........ 7

*United States v. Illinois*,
796 F. Supp. 3d 494 (N.D. Ill. 2025) ........ 11

*United States v. King Cnty., Washington*,

122 F.4th 740 (9th Cir. 2024) ........ 14

*United States v. Minnesota*,
2026 WL 2150211 (D. Minn. July 27, 2026) ........ 7

*United States v. Washington*,
596 U.S. 832 (2022) ........ 2, 16

*Valentin v. Hosp. Bella Vista*,
254 F.3d 358 (1st Cir. 2001) ........ 6

*Van Wagner Bos., LLC v. Davey*,
770 F.3d 33 (1st Cir. 2014) ........ 7

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000) ........ 7

**Constitution and Statutes**

U.S. Const. art. I § 8, cl. 4 ........ 3

U.S. Const. art. II §3 ........ 2

U.S. Const. art. VI, cl. 2 ........ 3

5 M.R.S §
199 ........ 20

17-A M.R.S. §

453 ........ 5, 20

29-A M.R.S. §
517 ........ 18
517(4) ........ 4, 10,18
517(6) ........ 4

8 U.S.C. §
1182 ........ 3, 17
1225 ........ 3, 17
1229a ........ 3, 17
1231 ........ 3, 17
1232 ........ 3
1324 ........ 3

**Regulations and Rules**

Fed. R. Civ. P. 12(b)(1)........................................................................................................ 5, 6

Fed. R. Civ. P. 12(b)(6)........................................................................................................... 6

## INTRODUCTION

Each day, federal law enforcement officers place themselves at risk to enforce federal law—both civil and criminal—and keep our Nation safe. Regardless of whether the law being enforced is civil or criminal, federal law enforcement is a dangerous job. Federal officers employ various tools and techniques to ensure their safety (and the safety of those they are charged with protecting) while performing their official duties, including taking certain measures to keep their activities and identities unknown to the public, the criminals they investigate, and agitators seeking to impede law enforcement. One such tool is the use of confidential license plates. To that end, the State of Maine has issued confidential license plates to federal law enforcement agencies for many years. But now it is refusing to issue them to U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) because it objects to their immigration enforcement missions (hereinafter "the Policy").

Maine recognizes the importance of confidential plates. Indeed, its own confidential license plate application explains that confidential plates are "issued for surveillance and other operations that may require the vehicle to go undetected *for safety purposes*." ECF No. 8-2 (Policy) at 2 (emphasis added). But Maine now conditions that protection on a federal agency head's promise to restrict federal immigration enforcement. A vehicle bearing a confidential plate may not be used "for the purpose of federal civil immigration enforcement" unless that work is incidental to an authorized criminal investigation. Compl. ¶ 38. The agency head must certify compliance under threat of state criminal punishment. *Id*. ¶¶ 37–38. In other words, the Policy tells federal agencies when they may use federal investigative vehicles to carry out federal law. Put plainly, it regulates what duties federal officers may perform and how under the threat of criminal prosecution. Beyond that, as alleged in the Complaint, Maine continues to issue confidential plates to other law enforcement agencies for undercover work and to ensure officer safety. *Id*. ¶¶ 39–40, 63, 70–72. By refusing to do the same for ICE and CBP, Maine is discriminating against the Federal Government. The policy thus violates the Supremacy Clause.

The State of Maine, Governor Janet Mills, Attorney General Aaron Frey, and Secretary of

State of Maine Shenna Bellows, (collectively "Maine") have moved to dismiss the United States' Complaint, claiming the United States does not possess standing to challenge the Policy and that the Complaint does not state a claim upon which relief can be granted. *See generally* ECF No. 7 (Defendants' Motion to Dismiss, hereinafter "MTD"). The United States possesses standing to challenge this unconstitutional Policy, which not only inflicts a sovereign injury upon the United States, but needlessly places federal officers at risk in the field. These injuries are also traceable to the Policy and are redressable by a favorable decision of this Court. As alleged in the Complaint, the Policy is invalid under the doctrine of intergovernmental immunity and should be enjoined where it unlawfully regulates and discriminates against the Federal Government. For the reasons below, this Court should deny Maine's Motion to Dismiss in its entirety.

## BACKGROUND

### I. Legal Framework

The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supremacy Clause incorporates principles of intergovernmental immunity; a state enactment is thus invalid if it "regulat[es] the United States directly or discriminat[es] against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (citation omitted). The President has a constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Subordinate officers in various federal agencies help the President discharge that duty. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203-04 (2020); *see also Tennessee v. Davis*, 100 U.S. 257, 263 (1879) (the Federal Government "can act only through its officers and agents"). Because the authority to execute the laws "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States," federal officers and agents "must act within the

States." *Davis*, 100 U.S. at 263. Accordingly, federal law enforcement officers carry out their duties within the states, including Maine.

For example, the Department of Homeland Security (DHS), through ICE, Homeland Security Investigations (HSI), and CBP, is principally responsible for enforcing our Nation's immigration laws, including the Immigration and Nationality Act (INA), and, pursuant to Congress's power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, make up the framework for the "governance of immigration and alien status," *see Arizona v. United States*, 567 U.S. 387, 395 (2012). The INA confers upon the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens who are unlawfully present in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231. As part of those enforcement efforts, DHS, through HSI, also investigates transnational crime and threats, including incidents of alien smuggling and human trafficking. *See* 8 U.S.C. §§ 1324, 1232.

Due to the nature of law enforcement operations, obtaining confidential registrations and license plates is critical to the success of those operations and to officer security. Compl. ¶ 23. Their missions depend on the agencies' ability to engage in undercover operations, conduct surveillance, approach targets safely, and execute arrests without alerting the targets. *Id*. ¶ 25. Confidentiality in these scenarios is essential to the law enforcement mission of preventing violence, preserving evidence, and protecting the public. Such law enforcement operations require federal law enforcement officers to blend into the environment to avoid premature detection that could undermine the mission and place them at risk. *Id*. If agents are forced to use public plates, enforcement targets may be able to track and evade enforcement. *Id*. ¶ 24. The use of confidential registrations and license plates ensures that critical operations are not compromised before they begin. *Id*.

## II. The Policy

Maine's Bureau of Motor Vehicles (BMV) is one of the bureaus within the Maine Department of State, which is overseen by the Maine Secretary of State, Shenna Bellows. It is responsible for, among other things, issuing vehicle registrations and license plates, and maintaining that data.[1]

Maine has administered a confidential license plate program for many years,[2] which enables certain individuals to obtain confidential license plates, including state and federal law enforcement agencies. Indeed, such plates are explicitly authorized under Maine law.[3] "Information on unmarked confidential plates will NOT be given out to any entity inquiring." Policy at 2(6) (emphasis in original). As recently as January of this year, all federal agencies including CBP and ICE (including HSI), could obtain confidential vehicle registrations and license plates in Maine. In February 2026, the Maine Secretary of State's Office sent a letter to federal agencies stating that the review of the policies was complete and as a result it would be using "a new application form for this special program that better clarifies the issuance of these plates to follow Maine law." ECF No. 7-2 at 1. This letter included a copy of the new application form. *Id.* at 2–3. Soon after the BMV policy pausing confidential plates went into effect, multiple federal agencies sought to renew their current confidential license plates. The Maine BMV refused to issue confidential plates unless the agencies executed the new application form which required the heads of the agencies to attest to the following statements:

- The plate(s) will only be used on the specified unmarked motor vehicle used primarily for law enforcement purposes.
- The agency will maintain an alternate legal registration (federal, municipal, county, or state).
- The plate(s) will **<u>NOT</u>** be loaned to another law enforcement agency for their use.

---

[1] *Bureau of Motor Vehicles*, Me. Dep't of the Sec'y of St., https://www.maine.gov/sos/bmv (last visited Sept. 2, 2026).
[2] 29-A M.R.S. § 517(4), (6) (enacted by P.L., 1993, ch. 683, Pt. A §2 (eff. Jan. 1, 1995).
[3] 29-A M.R.S. § 517(4) ("**Unmarked law enforcement vehicles.** An unmarked motor vehicle used primarily for law enforcement purposes, when authorized by the Secretary of State and upon approval from the appropriate requesting authority, is exempt from displaying a special registration plate. Records for all unmarked vehicle registrations are confidential.").

- The plate(s) will **<u>NOT</u>** be utilized for federal civil immigration enforcement, including, but not limited to, Operation Catch of the Day.
- The plate(s) will only be attached to a vehicle owned or leased by the applicant agency.
- The plate(s) will not be attached to a rental vehicle.
- The plate(s) must be renewed annually by this same process.

*Id*. at 1.

This new form differed in material respects from the prior form, which was a general request for confidential plates requiring little more than contact information, vehicle information, and a letter from the agency head. By contrast, the new form requires contact information, vehicle information, the initialing of multiple statements on how the vehicle will or will not be used within federal law enforcement operations, including that the vehicle will not be used for federal civil immigration enforcement, a certification by the chief law enforcement officer signing the form that the vehicle will only be used in accordance with the restrictions listed, and a perjury warning that states, "Under Title 17-A, Section 453, it is a Class D crime, punishable by up to a year in jail, and a $2000 fine, to make a written false statement, not believing it to be true, if done with the intent to deceive a law enforcement officer, or other public servant, in the performance of official duties." ECF No. 7-2 at 2–3.

In May 2026, the Maine BMV again modified the form for the federal confidential plate program. Rather than requiring an attestation that "[t]he plate(s) will **<u>NOT</u>** be utilized for federal civil immigration enforcement, including, but not limited to, Operation Catch of the Day," ECF No. 7–2 at 2(4), the form was changed to require an attestation that "[t]he plate(s) will not be utilized for the purpose of federal civil immigration enforcement, except where such use is incidental to or in support of the agency's authorized criminal investigation function." ECF No. 8–2 (Policy)[4] at 1(4). The rest of the form remained unchanged— including the threat of criminal prosecution. *Id*. at 1.

[4] The Policy is incorporated by reference in the United States' complaint, *see* Compl. ¶ 38, and, thus, may be considered at the motion-to-dismiss stage. *See Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998). (finding when "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)")).

## LEGAL STANDARDS

A motion to dismiss filed under Rule 12(b)(1) challenges subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence, including affidavits or other documents. *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001). The plaintiff bears the burden of establishing subject matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995).

Under Rule 12(b)(6), a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The factual "allegations must be enough to raise a right to relief above the speculative level" and a claim for relief must be plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). "Evaluating whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*, 4 F.4th 63, 70 (1st Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## ARGUMENT

### I. The United States Has Standing to Bring this Challenge

Constitutional standing is indispensable to the case-or-controversy requirement of Article III. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To show standing, "a litigant 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 86 (1st Cir. 2025) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). These elements are adequately pled in the complaint.

#### A. The United States Has Adequately Pled an Injury in Fact

The United States has pled an injury in fact sufficient to withstand dismissal where it has pled an injury that is "both concrete and particularized and actual or imminent, not conjectural or

hypothetical." *Van Wagner Bos., LLC v. Davey*, 770 F.3d 33, 37 (1st Cir. 2014) (internal citation and quotation marks omitted). "[T]raditional harms" that qualify as concrete injuries for purposes of standing "may also include harms specified by the Constitution itself." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). The Complaint sets forth two injuries: (1) sovereign injury and (2) the endangerment of officers, the public, and deterioration of operational effectiveness. Compl. ¶¶ 42–68. Both confer standing.

At the threshold, the United States has established that the Policy inflicts a sovereign injury. *Id.* ¶ 42. "It is beyond doubt that [a] complaint asserts an injury to" the "sovereignty" of the United States where there is a "violation of its laws." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). After all, "[v]indicating the public interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive." *Lujan*, 504 U.S. at 576. Thus, when federal law is violated, including the Constitution, the United States suffers a sovereign injury and has standing to sue. *See United States v. Minnesota*, 2026 WL 2150211, at *8–9 (D. Minn. July 27, 2026) (rejecting State's argument that "the CFTC's interest in enforcing federal law is too amorphous to constitute an injury in fact").

Here, the challenged Policy regulates and discriminates against the United States. Such a violation of the Supremacy Clause is a sovereign injury. *See United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026) ("[I]rreparable harm necessarily results from allowing California to enforce a law invalid under the doctrine of intergovernmental immunity."). Beyond that, being regulated or discriminated against by a policy is a traditional concrete harm. *See Allen v. Wright*, 468 U.S. 737, 757 (1984) ("stigmatic injury" from discriminatory policy is an injury if plaintiff is subjected to it). The Complaint also alleges that the Policy interferes with the United States' "sovereign authority to manage federal law enforcement activities." Compl. ¶ 42. Accordingly, the United States has adequately pled that the Policy poses "an injury to its sovereign rights" which is "sufficient to have standing to sue in the district court." *United States v. City of Pittsburgh*, 757 F.2d 43, 45 (3d Cir. 1985).

Beyond the sovereign harm, the Complaint alleges a traditional concrete injury as well.

Maine's perfunctory assertion that "the Complaint does not allege that any specific federal agency or officer has actually been harmed," MTD at 8, ignores allegations regarding the detrimental impact of the Policy on federal officers and the public. Compl. ¶¶ 43–64. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (citation modified). The allegations of harm described in the Complaint satisfy this standard. For example, without the ability to obtain confidential plates, federal law enforcement vehicles can be more readily identified, which can lead to the "track[ing] and evad[ing of] law enforcement" by members of the public, and may even result in agitators and targets "follow[ing] and imped[ing] law enforcement." Compl. ¶ 47. Moreover, "subjects may destroy evidence, evade apprehension, flee the jurisdiction, take countermeasures that endanger the public, or otherwise alter their behavior." *Id.* ¶ 48. Detection by the public also causes a host of operational complications. *Id.* ¶ 50. Federal law enforcement officers routinely engage in missions "requir[ing] operational anonymity, including threat assessments, protective intelligence, surveillance operations, task force operations, drug investigations, and state and local collaborative operations." *Id*. Without the ability to obtain confidential plates, federal officers may be required "to modify, delay, or forego operations, increasing risks to federal law enforcement officers and the communities they serve." *Id.* ¶ 51.

In addition, the Complaint details the impact of the Policy on the Federal Government's ability to protect the identities of federal officers "due to the increasing threats of targeted harassment and retaliation against federal officers and agents." *Id.* ¶ 56. For example, members of the public have "photograph[ed] officers' faces and run them through facial recognition applications that search social media and doxxing sites such as ICESpy.org, ICEList.is, and ICEList.info" to search for officers and their family members, harass them, and obstruct law enforcement. *Id.* ¶ 58. Such threats come from rioters, illegal aliens, and criminals. *Id.* ¶ 59. The Complaint notes that "ICE officers have faced an 8,000% increase in death threats and more than a 1,000% increase in assaults, harms that are exacerbated by doxxing websites that broadcast the

identities and home addresses of officers and their families, encouraging retaliation against them." *Id.* (citing Press Release, DHS, 8000% Increase in Death Threats Against DHS, ICE Law Enforcement as They Risk Their Lives to Remove the Worst of the Worst (Oct. 30, 2025), https://perma.cc/VXK9-MSBQ). Maine's sudden decision to halt the issuance of confidential plates to ICE and CBP officers increases these risks. Compl. ¶¶ 49, 51.

Thus, the United States "need not wait for an actual injury to occur before filing suit." *Maine v. United States Dep't of Health & Hum. Servs.*, 923 F.3d 209, 222 (1st Cir. 2019); *contra* MTD at 8. The injuries described in the Complaint regarding imminent threats to officer safety and federal law enforcement operations are sufficiently threatening for purposes of showing standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (injury must be "certainly impending" to satisfy standing requirement); *see also Virginia*, 2026 WL 2411521, at *14. So this element of standing is established.

**B. The United States' Injuries are Fairly Traceable to the Policy**

The United States' injury clearly is fairly traceable to the Policy because there is "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. Indeed, "[a] plaintiff can satisfy traceability by showing "that the defendant's conduct is one among multiple causes" of the alleged injury." *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 90 (1st Cir. 2025) (internal citation omitted).

Here, the Policy, which prohibits DHS-affiliated entities involved with civil immigration enforcement from obtaining confidential license plates, places federal officers and law enforcement operations at risk. Federal officers have long used confidential plates—as opposed to regular state plates—to conceal their identities and more effectively conduct surveillance and undercover operations. This is presumably why Maine has a confidential plate program and still issues them to state and local officers. As alleged, by refusing to issue confidential plates to ICE and CBP, the Policy places federal officers at risk of being doxxed and tracked, thus putting their operations and safety at risk. *See, e.g.*, Compl. ¶¶ 50–59. The removal of that longstanding law

enforcement tool harms federal operations and is traceable to the Policy.

### C. The United States' Injuries are Redressable

Maine argues that "the United States fails to satisfy the redressability requirement of Article III because the ultimate remedy it seeks cannot *guarantee* a cure for its alleged injury" since the "Secretary. . . [has] the sole authority to determine when exemptions [to the confidential plate program] are appropriate." MTD at 9 (emphasis added). But "[t]o carry its burden of establishing redressability, [the United States] need only show that a favorable ruling could *potentially* lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm." *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012) (emphasis added). Besides, the discretion Maine invokes belongs to a defendant here, exercised through an agency of this defendant State, not to some absent third party whose response could be a matter of conjecture. *Cf. Lujan,* 504 U.S. at 562. Indeed, it is no secret what the Maine Secretary of State thinks of federal immigration enforcement. *See Maine secretary of State Shenna bellows condemns ice activity in Maine* | NEWSCENTERMAINE.COM, https://www.newscentermaine.com/article/news/politics/elections/candidates/maine-secretary-state-shenna-bellows-condemns-ice-activity-governor-election/97-4cc5022d-3cab-42c2-ba29-3320581716c7 (last visited Sep 2, 2026) (condemning immigration enforcement activities as "lawless operations" and referring to the brave men and women of ICE as a "secret police"). An injunction against her adjudicating requests for confidential licenses based on her discriminatory and obstructive views would clearly redress the United States' injuries.

Maine's contrary theory—that the Secretary's discretion defeats redressability—rests on the inapposite case of *Taker v. Blanche*, 179 F.4th 96 (1st Cir. 2026), MTD at 9. The plaintiff in *Taker*, who sued to regain the ability to lawfully possess a firearm, could not establish redressability because an unchallenged protection-from-abuse order independently barred him from doing so. *Id*. at 102. The relief he sought would have left his legal position exactly where it started. But there is no independent bar to relief here. Section 517(4), the provision upon which

Maine bases its argument, does not prohibit issuing confidential plates to federal agencies engaged in immigration enforcement. Instead, it authorizes the Secretary to use its discretion to grant exemptions for unmarked law enforcement vehicles, full stop. The only thing standing between federal agencies and those plates is the condition the United States challenges. Remove it, and the regulation is gone. Maine's argument appears to be that a Defendant here will just use her discretion to effectively implement the policy even if she is enjoined. But that would be implementing the policy by another name. The United States seeks an injunction against Defendants' discriminatory and regulatory policies directed at the United States. Such an injunction would prevent massive denials based on "discretion" and thus redress any injury. That is the opposite of *Taker*. In fact, Maine's own submission shows how that "discretion" is exercised. The Secretary approved forty-eight requests across eight federal agencies in 2026. MTD at 4–5. Agencies that sign the form get plates. Agencies that will not disclaim federal civil immigration enforcement do not. MTD at 10 ("Maine acknowledges that officials tasked with civil immigration enforcement are not currently able to obtain a confidential license plate from the State."). That is a predictable chain of events, not speculation. *See Diamond Alternative Energy v. EPA*, 606 U.S. 100 at 121 (2025).

An order enjoining the Policy would redress the United States' harms by enabling ICE and CBP officers to once again obtain confidential license plates, which will restore the ability of the Federal Government to manage the way it conducts federal law enforcement activities. *See*, *e.g.*, *United States v. Illinois*, 796 F. Supp. 3d 494, 510 (N.D. Ill. 2025) ("Enjoining the Policies would redress the alleged harm by removing definitive impediments to federal immigration policy.").

## II. The Complaint States a Claim That the Policy Violates Intergovernmental Immunity

The United States also withstands dismissal on the merits by plausibly pleading that the Policy violates principles of intergovernmental immunity and is invalid under the Supremacy Clause as unlawful regulation and discrimination against the Federal Government.

**A. The Policy Directly Regulates the Federal Government**

States have no power to "in *any manner* control the operations of" the Federal Government. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819) (emphasis added). "[T]he activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). A state law regulates the United States when it "places [either] a prohibition or [a] mandate on the federal government." *Hancock v. Train*, 426 U.S. 167, 180 (1976). And the inquiry does not turn on degree: there are "no *de minimis* violations of the Constitution—no constitutional harms so slight that the courts are obliged to ignore them." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 36–37 (2004) (O'Connor, J., concurring in the judgment); *see United States v. California*, 921 F.3d 865, 883 (9th Cir. 2019) ("Supreme Court case law compels the rejection of a de minimis exception to the doctrine of intergovernmental immunity.").

The Policy is a direct regulation. It tells federal agencies, in writing, which federal laws their vehicles may be used to enforce. Compl. ¶¶ 77–79. In *Leslie Miller, Inc. v. Arkansas*, the Supreme Court struck down a licensing requirement precisely because it made federal contractors "desist from performance until they satisfy a state officer." 352 U.S. 187, 190 (1956) (per curiam) (citation modified). Maine tries to distinguish *Leslie Miller* on the ground that there, Arkansas erected a "direct barrier" to a federal contract. MTD at 12. But the barrier in *Leslie Miller* was a licensing condition, and the Court did not pause to measure how badly it obstructed the federal project. The issue was that a state officer's satisfaction stood between the Federal Government and the performance of its business. *Leslie Miller*, 352 U.S. at 190. So too here.

The Supreme Court's decision in *Johnson v. Maryland*, 254 U.S. 51 (1920), points the same way. There, Maryland had a general law requiring all drivers to be licensed; it neither targeted nor forbid the federal mail service wholesale. Yet Justice Holmes framed the question as "whether the State can interrupt the acts of the general government itself," *id.* at 55, and held that the concept of federal immunity "extends to a requirement that [the federal officials] desist from performance until they satisfy a state officer," *id.* at 57. The requirement did not "merely touch the Government servants remotely by a general rule of conduct"; it "la[id] hold of them in their specific attempt to

obey orders and require[d] qualifications in addition to those that the Government ha[d] pronounced sufficient." *Id.*

Maine's Policy arguably requires more of the Federal Government than the regulations at issue in *Leslie Miller* and *Johnson* did. Indeed, far from imposing "general rules that might affect incidentally the mode of carrying out," *Johnson*, 254 U.S. at 56, federal civil immigration enforcement, the Policy purports to regulate which federal statutes the Federal Government can and cannot enforce until they "satisfy a state officer." *Id*. at 57. Maine tells federal officers they must use regular public plates if they are enforcing immigration law. If federal law enforcement officers want confidential plates—which have historically been provided and still are to state and local officers—they must agree not to use the vehicles for immigration enforcement or share them with other agencies under the penalty of *criminal* prosecution. That directly tells federal officers what enforcement they can use their vehicles for.

Maine's response is that it has merely declined "to dedicate Maine's resources, property, or regulatory framework to assist with the United States' civil immigration enforcement policies." MTD at 12. But what Maine has really done is keep a program of general applicability for law enforcement vehicles and attached to it a condition governing the Federal Government's conduct beyond the program's subject matter. In other words, a confidential plate is not immigration assistance, it is a vehicle registration. Maine has not simply withheld resources. Maine argues that if confidential plates are so important why would the United States outsource them? MTD at 13. To start, there is no de minimis exception to regulation so that is irrelevant. *California*, 921 F.3d at 883. Beyond that, most cars are licensed by the state. So if federal officers could not use confidential state plates and had to use federal plates, their vehicles would be even *more* conspicuous. Imagine if Maine denied drivers licenses to federal officers unless they agreed to not enforce certain criminal laws. That would obviously not be declining to assist federal enforcement, it would be regulating and obstructing federal officers. Likewise, Maine here has set terms for federal immigration enforcement operations in Maine.

That distinction is dispositive. To be sure, a State cannot be commandeered to enforce

federal law. *See generally Printz v. United States*, 521 U.S. 898 (1997). But this is not commandeering Maine's employees to do anything other than administer its program equally as it has long done in the past. The fact that reviewing and approving an application might cost some resources does not transform it into commandeering. The Tenth Amendment is not violated whenever a federal law "will consume [state or local] employees' time and thus the State's resources." *Reno v. Condon*, 528 U.S. 141, 150 (2000). Could states deny federal officers access to public roads or airports because their use may cost the state money? Of course not. *See United States v. King Cnty., Washington*, 122 F.4th 740, 758 (9th Cir. 2024) ("To the extent King County argues that it has expended resources ensuring the safety of [a local airport] in response to ICE charter flights, it identifies no case treating this degree of background support as rising to the level of unconstitutional commandeering."). Maine's Policy fares no better.

Maine attempts to flip the Constitution on its head by turning any cost to the state as a means of obstructing federal law enforcement. But it cannot use its regulatory machinery to instruct federal officers on the exercise of federal authority. Indeed, "what cannot be done directly cannot be done indirectly." *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 322 (3d Cir. 2025) (quotation marks omitted). In *CoreCivic*, the Third Circuit invalidated a state law that banned state and local governments and private parties from making, renewing, or extending contracts to detain people for civil immigration violations. *Id.* at 319. Although the law did not name the Federal Government in its text, the Third Circuit probed the purpose and self-evident operation of the statute, "easily see[ing] the law for what it really [was]: a regulation" of the Federal Government. *Id.* at 325. But the Framers of the Constitution "did not intend" for federal operations to "depend on the discretion of the state governments," *McCulloch*, 17 U.S. at 327, 362. Yet that is the power Maine seeks to exert over the Federal Government's immigration enforcement authority. Simply put, Maine could not order DHS to stop carrying out its Congressionally mandated duty to conduct civil immigration enforcement. It cannot obtain the same result by making that promise at the price of a confidential license plate.

As the Ninth Circuit observed in granting the United States' motion for a preliminary injunction pending appeal against a California law that sought to require federal law enforcement officers to "visibly display identification" when "performing their enforcement duties," the Policy here "seeks to control [federal officers'] conduct in performing law enforcement operations." *California*, 173 F.4th at 1067. The Ninth Circuit held that the challenged identification requirement "purports to override the federal government's power to determine whether, how, and when to publicly identify its officers," "[a]nd in so doing, it aims to regulate the manner and conditions under which federal agents can enforce federal law." *Id.* The Ninth Circuit emphatically held that "if a state law directly regulates the conduct of the United States, it is void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations." *Id.* at 1067. And the District Court for the Eastern District of Pennsylvania held that a Philadelphia law that prohibited federal law enforcement from using vehicles that do not clearly identify the vehicle with information regarding the employing agency impermissibly regulated the Federal Government where it sought to control how federal law enforcement officers performed their duties and conducted operations. *City of Philadelphia*, 2026 WL 1906075, at *9–10. That reasoning applies squarely to Maine's decision to prohibit ICE and CBP from obtaining confidential license plates. Maine seeks to regulate the manner and conditions by which federal officers must operate when conducting their official duties and enforcing the law and in doing so make their vehicles and operations more conspicuous. *See id.* Maine has no power to impose such regulations. *North Dakota v. United States*, 495 U.S. 423 at 437–38 (1990) ("States may not directly obstruct the activities of the Federal Government."). That Maine claims the Policy applies equally to state law enforcement agencies makes no difference. MTD at 11. Maine collapses the distinct doctrines of direct regulation and discrimination (which the Policy also fails). "The Supremacy Clause prohibits States from enacting a law that directly regulates federal operations even if the law regulates state operations in the same manner." *California*, 173 F.4th at 1067.

The criminal sanction removes any doubt the Policy is a direct regulation. Maine does not just request the attestation, it also demands that the agency head acknowledge via signature that a false statement on the form is a Class D crime, Policy at 1, and it has told the Department of Justice that sixteen federal applications may already have crossed that line, MTD at 4. But federal officers have long been held immune from state prosecutions within their duties. *See, e.g., Ex parte Neagle*, 135 U.S. 1 at 75–76 (1890). A regime that conditions an officer-safety measure like confidential plates on a sworn representation about federal civil immigration enforcement priorities—and threatens prosecution if the representation proves inaccurate—is regulation in its most coercive form.

In the end, the text, purpose, and effect of the Policy are to control federal officers in the commission of their official duties in Maine and to chill the zealous enforcement of federal law. The Policy is therefore void under the Supremacy Clause and this claim should not be dismissed.

**B. The Policy Discriminates Against the Federal Government**

The United States has stated a claim that the Policy discriminates against the Federal Government. Discrimination occurs when a state "treats someone else better than" the Federal Government, *North Dakota*, 495 U.S. at 438, or "singl[es] out the Federal Government for unfavorable treatment." *Washington*, 596 U.S. at 839. Maine's principal argument is that its Attorney General advised the Department of Justice, five days before suit, that the Secretary requires an application from "all law enforcement agencies, both state and federal." MTD at 5, 11. That is a fiction. Condition four of the Policy dictates what the applicant may *enforce*, and it reaches only "*federal* civil immigration enforcement." Policy at 1 (emphasis added). It singles out federal immigration enforcement only, not state or local law. And immigration is an inherently federal function. *Arizona*, 567 U.S. at 394. Maine's fig leaf appears to be that sometimes some local and state officers can assist with immigration enforcement. Under 287(g) agreements, state and local officers are *deputized* federal officers that can assist with immigration enforcement. *United States v. Alas*, 63 F.4th 269, 274 (4th Cir. 2023) (citation modified). So even then this

would be targeting federal law enforcement. But in Maine that is a null set, as Maine *banned* all such cooperation. So, as the Complaint alleges, federal agencies alone bear the substantive restriction. Compl. ¶¶ 5, 39–41. A Maine trooper initials that line and surrenders nothing. *See* Policy at 1. A federal agent initials it only by surrendering authority conferred by Congress. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231. That is classic discrimination.

Maine says that is the wrong comparator presumably because only the Federal Government engages in immigration enforcement. The Federal Government performs many functions no State performs, and it would be extraordinary if a State could accomplish discrimination against the United States—and skirt the Supremacy Clause—simply by naming the function instead of the sovereign. That would flip the Supremacy Clause on its head. Indeed, taken to its endpoint, Maine's theory would allow states to discriminate more against inherently federal functions like the military. This case is thus like *Boeing Co. v. Movassaghi*, where the Ninth Circuit held that a California statute singling out a federally owned nuclear site for special cleanup obligations discriminated against the Federal Government. 768 F.3d 832, 842 (9th Cir. 2014) ("A state or local law discriminates against the federal government if it treats someone else better than it treats the government.") (citation modified). Maine's demand for a perfect comparator is therefore misplaced. Where a policy applies by its terms only to federal actors, it burdens them because of their federal "status," and no comparator is needed. *North Dakota*, 495 U.S. at 438.

In any event, a comparator appears on the face of Maine's Policy. As Maine's February letter explained, ECF No. 7-2 at 1, the State had paused the issuance of new confidential plates to federal agencies while it reviewed its program and policies. In other words, this pause impacted federal agencies alone. So does the revised attestation form it produced. Contrary to Maine's arguments, the Policy governs only federal agencies seeking confidential plates in Maine. No state or local agency heads must swear off a category of law enforcement to obtain the plates for their officers. Including for criminal and civil functions. Maine thus burdens the United States with a condition that is imposed on no other sovereign. That is the beginning and the end of the discrimination inquiry. And Maine's proposed substitute—comparing the United States to the

forty-eight applications the Secretary approved across eight federal agencies in 2026, MTD at 5—is foreclosed by *Dawson*. The comparator turns on "how the State has defined the favored class[.]" 586 U.S. at 178; *see also id*. at 179 ("[T]he relevant question isn't whether federal retirees are similarly situated to state retirees who don't receive a tax benefit; the relevant question is whether they are similarly situated to those who do."). Maine defined its favored class as unmarked vehicles "used primarily for law enforcement purposes." 29-A M.R.S. § 517(4). That includes federal vehicles engaged in civil immigration enforcement. Simply put, once Maine has defined its favored class, it cannot discriminate against Federal Government vehicles operating within that sphere.

### C. Maine's Reliance on the Tenth Amendment is Misplaced

The Tenth Amendment is not a basis to dismiss the United States' well-pleaded Complaint. Under the Tenth Amendment, "Congress may not simply 'commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *New York v. United States*, 505 U.S. 144, 161 (1992) (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981)). But that requires, first, power reserved to the States. In the context of immigration, "[t]he Government of the United States has broad, undoubted power." *Arizona*, 567 U.S. at 394. "'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co.* v. *Stranahan,* 214 U.S. 320, 339 (1909)). So the State lacks any power.

Maine argues that it may regulate vehicle registration. MTD at 17. Of course it may.[5] The United States does not seek to run Maine's BMV. Rather, it only asks that Maine stop conditioning a generally available confidential plate program on the United States' promise to abandon the

[5] The question, however, has never been whether a State is regulating in its own domain. It is whether the State is discriminating against the Federal Government or regulating it directly. Maine does both. Indeed, invoking the "police power" label supplies no blanket defense to the United States' intergovernmental immunity claims. If it did, *Johnson* would have come out the other way. After all, Maryland's driver-licensing regime was as "classic," MTD at 17, an exercise of the police power as Maine's registration regime, and it still could not be applied to a federal employee carrying out federal duties. 254 U.S. 51, 55–57.

enforcement of federal law expressly delegated to it by Congress. Invalidating the Policy as applied to the Federal Government would not amount to commandeering where regulation of federal officers and explicit discrimination against the Federal Government are not powers reserved to the states. Instead, an order enjoining the Policy would prevent Maine from controlling the Federal Government's lawful exercise of its own sovereign authority to enforce the immigration laws. *See New York*, 505 U.S. at 156 ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States ..."). It would turn the Constitution on its head to suggest the Tenth Amendment allows states to regulate or discriminate against the Federal Government. Once Maine offered confidential plates, it could not deny them discriminatorily.

And the result of such an order is not that Maine employees will be required to enforce immigration law, just that Maine cannot deny confidential plates to federal officers that they otherwise issue to state and local officers. *Supra* Section II (A). Processing and issuing confidential plates (as Maine does for standard plates) is hardly commandeering. By Maine's logic, it could refuse to issue any plates to United States employees lest they be commandeered. That is simply too broad a reading of the Tenth Amendment. In filing suit to enjoin the Policy, the United States is not seeking to compel Maine to "assist with the United States' civil immigration enforcement policies." MTD at 12. Instead, the United States merely asks Maine to resume its issuance of confidential license plates to ICE and CBP in the normal course of its operations and to refrain from unlawfully regulating and discriminating against the Federal Government.

Maine argues that the Federal Government's relief here would amount to "coercing Maine to speak," MTD at 20, but concedes that it "does not enjoy individual rights under the First Amendment." *Id*. That concession is dispositive: Maine cannot import a right it disclaims by relabeling it an aspect of anticommandeering. The theory also mischaracterizes the plate at issue. Unlike in *Wooley*, MTD at 19–20, the confidential plates do not reflect a message at all—like live free or die—much less one attributable to Maine. A confidential plate is designed to be untraceable to the agency operating the vehicle; it "is issued for surveillance and other operations that may

require the vehicle to go undetected." Policy at 2. No observer can attribute such a plate to any agency, let alone infer Maine's endorsement of that agency's policies. The plate says nothing. That is the point. Maine's stated fear that voters will assume the State "endorses" federal immigration policy, MTD at 20, depends on the public identifying the vehicle as federal—the very scenario the confidential license plate prevents.

## III. The Claims Against Attorney General Frey Should Not be Dismissed[6]

Maine seeks dismissal of Attorney General Frey on the ground that the Complaint makes no substantive allegations against him. MTD at 13–14. That is not accurate.

Attorney General Frey is the official who communicated Maine's position on the Policy to the Department of Justice, who asserted the Secretary's authority to impose the challenged condition, and who advised the United States that sixteen federal applications appeared to contain "material false information." MTD at 4–5. He is also Maine's chief law enforcement officer,[7] with authority over prosecutions under 17-A M.R.S. § 453—the statute printed on the Policy as the sanction for a false attestation. Policy at 1. Because the Complaint challenges a regime enforced by the threat of that criminal sanction, Compl. ¶¶ 37, 78, the Attorney General has a connection to the enforcement of the act and an injunction running against the Attorney General would redress the United States' injuries.

## CONCLUSION

The United States respectfully requests that this Court deny Maine' Motion to Dismiss Plaintiff's complaint in its entirety.

[6] As to Governor Mills, if Defendants confirm that the United States can obtain complete relief from the remaining Defendants, the United States does not oppose her dismissal.
[7] *See* 5 M.R.S § 199 ("The Attorney General may, in the Attorney General's discretion, act in place of or with the district attorneys, or any of them, in instituting and conducting prosecutions for crime, and is invested, for that purpose, with all the rights, powers and privileges of each and all of them.").

DATED: September 8, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
Civil Division

ANDREW B. BENSON
United States Attorney
District of Maine

JACQUELINE COLEMAN SNEAD
Deputy Director

*/s/ Garrett Greene*
Garrett Greene (TX Bar No. 24096217)
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, D.C. 20044-0386
(202) 549-9429
Garrett.greene@usdoj.gov

*Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2026, a true and correct copy of the foregoing document was electronically filed using CM/ECF for the District of Maine, which will provide electronic notice and an electronic link to this document to all attorneys of record.

By: *_/s/ Garrett Greene_*
Garrett Greene
Senior Litigation Counsel
U.S. Department of Justice
Civil Division